UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ROSETTA WATSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 4:17CV1268 JCH |
| CITY OF MAPLEWOOD, MISSOURI, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the City of Maplewood Missouri's Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim, filed June 19, 2017. (ECF No. 21). The motion is fully briefed and ready for disposition.

## BACKGROUND[1]

Defendants in this case are the City of Maplewood ("Maplewood" or "the City"), Maplewood City Manager Martin Corcoran ("Corcoran"), Maplewood Chief of Police Stephen Kruse ("Kruse"), and Maplewood Director of Public Works and Assistant City Manager Anthony Traxler ("Traxler"). (Compl., ¶ 2). Defendants enacted laws including Chapter 12, Article II of the Maplewood Code of Ordinances, § 12-25, which requires every resident to obtain and maintain an occupancy permit from the City, and Chapter 34, Article VIII of the Maplewood Code of Ordinances, §§ 34-240 *et seq.*, which defines nuisances and authorizes officials to revoke a resident's occupancy permit if the nuisance is not abated. (*Id.*, ¶¶ 2, 3). Hereinafter, these two sections collectively will be referred to as the "Nuisance Policy."

---

[1] The Court's background section is taken largely from Plaintiff's Complaint, to which Defendants have not yet filed an answer.

As relevant here, the Nuisance Policy defines "nuisance" as follows:

> In addition to any other act declared to be a nuisance by this Code or other ordinances of the city, nuisances are hereby defined and declared to be as follows:….
>
> (17) Any premises upon which any of the following acts or conditions have occurred or continue to occur, whether by the owner, occupants or persons frequenting or congregating about the property:
>
>> Commission of acts which are prohibited by federal law or state statute committed within the premises, or on the property thereof, or within the immediate vicinity of the property, and which have resulted in arrests that are classified as felonies occurring two or more times within a period of 90 days which acts affect the safety, convenience and tranquility of persons residing, making use or conducting business within the adjacent area;….
>>
>> More than two instances within a 180-day period of commission of acts which are prohibited by state statute or city ordinance committed within the premises, or on the property thereof, or within the immediate vicinity of the property and which have resulted in arrests which acts affect the safety, convenience and tranquility of persons residing, making use or conducting business within the adjacent area;….
>>
>> More than two instances within a 180-day period of incidents of peace disturbance or domestic violence resulting in calls to [] the police.

(ECF No. 1-1, PP. 9-11). The Nuisance Policy further provides the following with respect to abatement:

> In all other cases [other than those in which an immediate threat to the public health, welfare or safety is apparent], the city manager or his designee shall hold a hearing [to] determine whether a nuisance exists and whether and how it should be abated.
> (a) At least five days' notice shall be given of such hearing to the owner and occupant of the premises upon which the alleged nuisance exists, or to such person's agent, and to the person causing or maintaining the alleged nuisance if other than the owner or occupant and if such person can be found. Such notices shall be given in writing and delivered in person to the party's residence or place of business.
> (b) All interested parties may appear at the hearing and testify and present evidence concerning the alleged nuisance.
> (c) In determining whether the activity or conditions constitute a nuisance, the city manager or his designee shall consider the following factors:

1. The magnitude of the harm caused by the alleged detrimental activity or conditions;
2. The length of time that the alleged detrimental activity or conditions have existed;
3. The effect of the activity or conditions at the property on the value of adjacent properties and those in the surrounding area;
4. The number of times that public safety officers have been dispatched to the property; and
5. The extent of efforts by the owner or person having charge of the property to remedy the alleged detrimental activity or conditions.

(d) If, after the hearing, it is found that a nuisance exists and that it must be abated, the city manager or his designee may order the owner or occupant of the premises on which the nuisance exists or the person other than the owner or occupant who caused or maintains the nuisance, to abate the nuisance within a prescribed period of time, or abate it by other means.

(e) The city manager or his designee shall effect the abatement of the nuisance by any measures necessary to cause its cessation and the prevention of its recurrence, including the ordering of revocation of occupancy permits for the persons residing at the dwelling or place of business where the nuisance has occurred and the denial of occupancy permits within the city to those persons for a period not to exceed six months, or the closure of the premise where the nuisance has occurred for a period not to exceed six months.

(*Id.*, P. 12).

From June, 2010, until approximately June, 2012, Plaintiff Rosetta Watson ("Watson") lived at 2507 Bellevue Avenue, Apt. 9, Maplewood, Missouri (hereinafter "the Property"). (Compl., ¶ 16). Watson's rent at the Property was subsidized by a Section 8 voucher issued by the Housing Authority of St. Louis County. (*Id.*, ¶ 41).

During the relevant time period, Watson was the victim of repeated domestic violence attacks perpetrated by her former boyfriend, Robert Hennings ("Hennings"). (Compl., ¶ 42). Watson describes the incidents as follows:

> 45. On September 24, 2011, Hennings visited Ms. Watson at the Property, where he began drinking and verbally abusing her. After she asked him to leave, she closed the front door of the Property and latched the chain. Later, Hennings returned to the Property and began knocking on the front door. Ms. Watson, who was in bed asleep at the time, told Hennings that he was not allowed inside. Hennings kicked open the front door and entered Ms. Watson's bedroom. Hennings told Ms. Watson that he was "no longer on papers" and was going to

"kick [her] ass." He struck her in her face with a closed fist.

46. Fearing more physical abuse, Ms. Watson fled the Property and called the police. Police arrived and arrested Hennings for assault in the third degree. They also photographed lacerations on Ms. Watson's lip and the damage to her front door.

47. On November 8, 2011, Ms. Watson again sought police assistance when Hennings shoved her in her home. When police arrived, Hennings admitted he had shoved her. Police arrested Hennings for domestic assault in the third degree.

48. On January 7, 2012, Ms. Watson contacted the police because she became fearful during an argument with Hennings and wanted him to leave her home. When police arrived, Hennings agreed to return to his residence.

49. On February 22, 2012, Ms. Watson returned after a trip and found Hennings at the Property. She wanted him to leave, but he refused. Hennings struck Ms. Watson's breast and began to choke her, and Ms. Watson physically defended herself. She called the police, and Hennings fled the Property.

50. The police apprehended Hennings away from the Property and arrested him for domestic assault in the third degree. Ms. Watson was issued a summons for domestic assault in the third degree based on injury to Hennings when she defended herself from his attack.

(*Id.*, ¶¶ 45-50).[2]

In a letter dated March 7, 2012, Traxler notified Watson that a hearing pursuant to the City's Nuisance Policy was scheduled for March 22, 2012. (Compl., ¶ 59, citing ECF No. 1-4).[3] Traxler stated the purpose of the hearing was "to determine whether the situation constitutes a nuisance and, if so, how the nuisance should be abated." (ECF No. 1-4). Watson's presence was requested at the hearing, and she was informed of her right to hire an attorney and/or to present

---

[2] The City enforced its Nuisance Policy against Watson based on the above described incidents. According to Watson, however, Hennings continued to perpetrate acts of domestic violence against her after February, 2012, and eventually was sentenced to incarceration. (Compl., ¶¶ 51-57). Hennings died in 2013. (*Id.*, ¶ 58).
[3] The letter asserted that according to the occupancy permit, both Watson and Hennings were the tenants at the Property. (*See* ECF No. 1-4).

evidence on her own behalf. (*Id.*).[4]

That same day, Traxler sent a letter to Mr. Craig Biesterfeld of Husch Blackwell Sanders LLP, requesting his assistance in the preparation and presentation of the City's case during the hearing. (ECF No. 1-6). The letter listed the September 24, 2011, November 8, 2011, January 7, 2012, and February 22, 2012, incidents as ones to be presented in testimony. (*Id.*). It further stated that Watson's contacts with police regarding Hennings "appear to fall within the provisions of Chapter 34 Section 17F, 'more than two instances within a one hundred eighty (180) day period of peace disturbance or domestic violence resulting in calls to the police.'" (*Id.*).

On March 22, 2012, Corcoran authorized Traxler to serve as the Hearing Officer for the hearing against Watson. (ECF No. 1-7).[5] Watson appeared at the hearing, without counsel. (Compl., ¶ 64). On April 10, 2012, Traxler issued the City's Findings of Fact, Conclusion of Law, and Order regarding Property Located at 2507 Bellevue Avenue, Apt. 9, Maplewood, Missouri. (ECF No. 1-8). Traxler found that "[a]s established by the testimony of City of Maplewood police officers, there have been repeated instances at the Property of peace disturbance and/or domestic violence resulting in numerous calls to the police." (*Id.*, P. 2). He continued to find that "[a]s a result of these instances of peace disturbance and domestic violence, Maplewood police officers have been put at risk," and "[g]iven the nature and number of incidents, a high magnitude of harm has been caused." (*Id.*, P. 3). Based on these findings, Traxler concluded that "[m]ore than two instances within a 180-day period of incidents of peace disturbance or domestic violence resulting in calls to the police have occurred at the Property,"

---

[4] Traxler also notified Mr. James Eichenlaub of Bellevue Apartments, LLC, the operator of Watson's housing, of the scheduling of the hearing. (Compl., ¶ 60; ECF No. 1-5).
[5] Watson maintains Traxler was unable to act impartially, based on his direction of and involvement in the prosecution of the City's case against Watson. (Compl., ¶ 63).

and "[s]uch incidents constitute a public nuisance." (*Id.*). Traxler thus ordered as follows:

> Pursuant to Chapter 34 Article VIII of the Maplewood Code of Ordinances and the predecessor codified sections thereof, Anthony Traxler, Hearing Officer, hereby orders as follows:
>
> 1. The occupancy permit issued to Rosetta R. Watson for 2507 Bellevue, Apartment #9, is hereby revoked for a period of six (6) months commencing on the date set by the Maplewood Chief of Police, and Rosetta R. Watson shall not be entitled to occupy such property and shall be denied an occupancy permit within the City of Maplewood for a period of six (6) months commencing on the date set by the Maplewood Chief of Police.

(*Id.*).[6]

In a letter dated April 10, 2012, Kruse advised Watson that she must vacate the premises at 2507 Bellevue Avenue # 9 by 5:00 p.m. on May 30, 2012. (ECF No. 1-9). After obtaining permission to extend her stay in Maplewood for a few days, Watson left the Property and moved to the City of St. Louis in early June, 2012. (Compl., ¶ 75). Watson maintains that in addition to being forced to leave her home and the community in which she enjoyed living, she lost her Section 8 voucher from the Housing Authority of St. Louis County because her lease was not renewed. (*Id.*, ¶¶ 81, 82).[7]

Watson filed the instant Complaint on April 7, 2017, claiming Defendants' actions in enacting and enforcing the Nuisance Policy infringed on her fundamental constitutional rights. Specifically, Watson alleges violations of the following: Rights of Speech and Petition (U.S. Const. amend. 1) (Count I); Equal Protection (U.S. Const. amend. XIV) (Count II); Right to Travel (U.S. Const. amend. XIV, art. IV, § 2) (Count III); and Due Process (U.S. Const. amend.

---

[6] Traxler issued a similar order against Hennings. (ECF No. 1-8, P. 3).

[7] The Housing Authority eventually reinstated Watson's voucher in July, 2016, after being notified that its termination violated the Violence Against Women Act ("VAWA") and other legal protections. (Compl., ¶ 85). Watson alleges that during her time without the voucher, however, she was forced to move approximately eight times, and further suffered periods of homelessness. (*Id.*, ¶ 83).

XIV) (Count IV). (Compl., ¶¶ 88-116).[8]  Watson further claims preemption by the Violence Against Women Act, 42 U.S.C. § 14043e-11 (Count V). (*Id.*, ¶¶ 117-122).  As relief, Watson seeks a declaration that the Nuisance Policy violates the United States and Missouri Constitutions and other legal provisions; an award of compensatory damages against all Defendants, and punitive damages against the individual Defendants; and an award of the costs and expenses of this action, including attorneys' fees.  (*Id.*, P. 24).

As noted above, Defendant City of Maplewood filed the instant Motion to Dismiss on June 19, 2017, asserting Watson's claims must be dismissed for failure to state a claim for which relief may be granted.  (ECF No. 21).

### **STANDARD FOR MOTION TO DISMISS**

In ruling on a motion dismiss, the Court must view the allegations in the complaint in the light most favorable to plaintiff.  *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).  The Court, "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (citation omitted).  The complaint's factual allegations must be sufficient "to raise a right to relief above the speculative level," however, and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct.

---

[8] In Counts VI-IX, Watson alleges violations of the corresponding provisions of the Missouri Constitution. (Compl., ¶¶ 123-152).

1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555 (pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not do)).

**DISCUSSION**

I. **First Amendment Freedom Of Speech And Right To Petition**

"Retaliation by a public official in response to an exercise of First Amendment rights forms a basis for § 1983 liability." *Palmore v. City of Pacific*, 851 F.Supp.2d 1162, 1172 (E.D. Mo. 2010) (citing *Naucke v. City of Park Hills, et al.*, 284 F.3d 923, 927 (8th Cir. 2002)). "To establish a claim for First Amendment retaliation under § 1983, the plaintiff must show that s/he 1) engaged in a constitutionally protected activity; 2) that the government official's adverse action caused him/her to suffer an injury which would chill a person of ordinary firmness from continuing…in that activity; and 3) that the adverse action was motivated in part by the exercise of [her] constitutional rights." *Id.* (internal quotations and citations omitted).

In the instant case the Court finds that with her calls to the police, Watson engaged in constitutionally protected activity.[9] *See, e.g.*, *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (internal quotations and citation omitted) (recognizing the right to petition the Government for a redress of grievances as "one of the most precious of the liberties safeguarded by the Bill of Rights"). *See also Whisman through Whisman v. Rinehart*, 119 F.3d 1303, 1313 (8th Cir. 1997) (citation omitted) ("Government action designed to prevent an individual from utilizing legal remedies may infringe upon the First Amendment right to petition the courts."); *Meyer v. Board of County Commissioners of Harper County, Oklahoma*, 482 F.3d 1232, 1243

---

[9] Maplewood argues the Nuisance Policy does not infringe on constitutionally protected activity, as the nuisance designation applies only to *premises* in which more than two instances of peace disturbance or domestic violence have occurred. Maplewood's attempted limitation ignores the language of the policy, however, which clearly designates nuisances as premises in which more than two such instances "resulting in calls to [] the police" have occurred. (*See* ECF No. 1-1, P. 11).

(10th Cir. 2007) ("denying the ability to report physical assaults is an infringement of protected speech"); *Estate of Morris v. Dapolito*, 297 F.Supp.2d 680, 692 (S.D.N.Y. 2010) (internal quotations and citation omitted) ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment."). The Court further finds Watson sufficiently pleads a chilling effect on her activities, as she claims the Nuisance Policy penalized her for exercising her First Amendment rights by using her constitutionally protected activity as a basis for identifying her home as a nuisance, and then utilizing said identification as a basis to revoke her ability to obtain an occupancy permit for a period of six months. *See Estate of Morris*, 297 F.Supp.2d at 694 ("[T]he requirement of a chilling effect [*i.e.*, that the plaintiff changed her behavior in response to defendant's action] is inappropriate in the unusual circumstances of the present case, where the exercise of First Amendment rights allegedly caused the person exercising them to be subjected to severe punishment….Such summary punishment for the exercise of constitutional rights is clearly a more serious infringement of those rights than a mere chilling of their continued exercise.").

With respect to the causal link, *i.e.*, that Maplewood's adverse action was motivated in part by Watson's exercise of her constitutional rights, "direct evidence of retaliatory intent is rarely available." *Meyer*, 482 F.3d at 1244. The Court thus "must consider the reasonable inferences that may be drawn from the available evidence." *Id.* In this case, Watson alleges as follows in her Complaint: "Defendants' enforcement of the Nuisance Policy against Ms. Watson based on calls made to the police reporting domestic violence perpetrated against her directly violated her right to petition the government to redress grievances and to freedom of speech." (Compl., ¶ 93). Upon consideration the Court concludes that with this allegation, Watson's claim of retaliation is sufficient to survive at this stage of the proceeding. *See Montagno v. City*

*of Burlington*, Case No. 2:16CV232, 2017 WL 2399456, at *10 (D. Vt. June 1, 2017). This portion of Maplewood's Motion to Dismiss will therefore be denied.

As further support for its denial, the Court notes that in Count I Watson appears to lodge a facial challenge to the Nuisance Policy as well. (*See* Compl., ¶¶ 92 ("The language of the Nuisance Section violates the First Amendment on its face by imposing penalties, including banishment, on the basis of calls to the police or crime occurring at a property, regardless of whether the tenant was the victim or perpetrator, thereby outright burdening tenants' ability to report crime and seek police assistance."); 94 ("The Nuisance Policy, particularly as applied to victims of crime, such as domestic violence, or those in need of emergency assistance, does not advance any compelling government interest and is not narrowly tailored to justify the infringement of the fundamental right to call the police.")). As relief, Watson requests a declaration that the Nuisance Policy violates both the United States and the Missouri Constitutions. (*Id.*, P. 24). Maplewood addresses this assertion by maintaining the Nuisance Policy does not infringe on constitutionally protected activity, as it prohibits certain acts and conditions rather than calls to the police. As noted in footnote nine, *supra*, however, Maplewood's attempted limitation ignores the language of the policy, which clearly designates nuisances as premises in which more than two instances of peace disturbance or domestic violence "*resulting in calls to [] the police*" have occurred. (*See* ECF No. 1-1, P. 11 (emphasis added)). Watson's First Amendment facial challenge to the ordinance thus survives Maplewood's Motion to Dismiss.

II. **Equal Protection**

In Count II of her Complaint, Watson asserts Maplewood's Nuisance Policy violated her right to equal protection of the law. (Compl., ¶¶ 97-104). As the Court construes the Count,

Watson appears to make two separate claims. She first contends that in enacting the Nuisance Policy, Maplewood intentionally discriminated against women by singling out calls relating to domestic violence, the vast majority of which are placed by women. (*Id.*, ¶ 99). Watson further posits that in enforcing the Nuisance Policy against victims of domestic violence, Maplewood punishes and/or bans women who seek police assistance. (*Id.*, ¶ 100).

With respect to Watson's first claim regarding enactment, "[a] policy that does not facially discriminate against a discrete group will not violate the Equal Protection Clause without some showing of discriminatory purpose." *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 511 (8th Cir. 2015) (citation omitted).

> Proving discriminatory purpose is no simple task. It requires a showing that the law or practice in question was implemented at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

*Id.* (internal quotations and citations omitted).

Upon consideration, the Court finds Watson's allegations sufficient to survive Maplewood's Motion to Dismiss. In other words, while the Court agrees Watson's eventual burden is high, she is entitled to engage in discovery and present evidence to support her claim that discrimination against women was a motivating factor in Maplewood's decision to enact the Nuisance Policy. This portion of Maplewood's Motion to Dismiss will therefore be denied.

With respect to Watson's second claim regarding enforcement, "[t]o establish a gender-based claim under the Equal Protection Clause, [Watson] must, as a threshold matter, demonstrate that [she has] been treated differently by a state actor than others who are similarly situated simply because [she belongs] to a particular protected class." *Keevan v. Smith*, 100 F.3d 644, 647-48 (8th Cir. 1996) (citation omitted). "Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable

equal protection claim." *Id.* at 648 (internal quotations and citation omitted).

In its motion, Maplewood points out that it took the same measures with respect to both Watson and Hennings, on the basis of the same underlying acts. In response, Watson offers no evidence (or even allegation) that Maplewood enforces its Nuisance Policy differently for men than women. This portion of Maplewood's Motion to Dismiss will therefore be granted.

### III. Right To Travel

In Count III of her Complaint, Watson alleges that her fundamental right to travel was infringed by the Nuisance Policy. (Compl., ¶¶ 105-110). The United States Supreme Court has held that the "right to travel" embraces at least three different components: "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). In *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005), the Eighth Circuit Court of Appeals considered the interplay of the constitutional right to travel and a residency restriction.[10] The Court first concluded the statute at issue did not violate the fundamental right to interstate travel. *Doe v. Miller*, 405 F.3d at 711-12. The Court continued to hold that even assuming there was a fundamental right to *intra* state travel, it was not implicated by the statute, as it would "likely be 'correlative' to the right to interstate travel discussed in *Saenz*, or would consist of a 'right to travel locally through public spaces and roadways.'" *Id.* at 713 (citations omitted). *See also Id.* ("By contrast, the decisions finding infringement of a fundamental right to intrastate travel have involved laws that trigger

---

[10] The statute at issue in *Miller* prohibited persons convicted of certain sex offenses involving minors from residing within 2000 feet of a school or registered child care facility. *Doe v. Miller*, 405 F.3d at 704.

- 12 -

concerns not present here—interference with free ingress to and egress from certain parts of a State (*Johnson* and *Lutz*) or treatment of new residents of a locality less favorably than existing residents (*King*))."

Finally, the *Miller* court considered whether there existed a fundamental right "to live where you want." *Doe v. Miller*, 405 F.3d at 713. In deciding against the existence of such a right, the Eighth Circuit held as follows:

> This ambitious articulation of a proposed unenumerated right calls to mind the Supreme Court's caution that we should proceed with restraint in the area of substantive due process, because by extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. Some thirty years ago, our court said we cannot agree that the right to choose one's place of residence is necessarily a fundamental right, and we see no basis to conclude that the contention has gained strength in the intervening years.

*Id.* at 713-14 (internal quotations and citations omitted).

Upon consideration of the foregoing, the Court finds Watson's Count III Right to Travel claim must be dismissed. Watson frames her claim purely as one involving a "fundamental" right (*see* Compl., ¶¶ 106-109), and the Eighth Circuit clearly has held that the right to choose one's place of residence is not such a right. *See Doe v. Miller*, 405 F.3d at 714. This portion of Maplewood's Motion to Dismiss will therefore be granted.[11]

## IV. **Due Process**

After incorporating by reference all preceding allegations, Watson's due process claim states in its entirety as follows:

---

[11] In *Doe v. Miller*, once the Eighth Circuit decided the statute did not implicate a fundamental right, it continued to review the statute to determine whether it met the standard of "rationally advancing some legitimate governmental purpose." *Id.* at 714 (internal quotations and citation omitted). Plaintiffs there argued that the residency restriction was unconstitutional under the doctrine of substantive due process, however. *Id.* at 709. In this case, Watson claims only that the Nuisance Policy infringed upon a fundamental right, and so the Court will not engage in rational basis review.

112. The Fourteenth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law.

113. Defendants' banishment of Ms. Watson from her home and from the City for six months deprived her of due process, as banishment is not justified by the City's interest and is excessive punishment.

114. Defendants' enforcement of the Nuisance Policy also deprived Ms. Watson of her property interest in her leasehold by ordering her to vacate her rental home without adequate procedural protections, such as hearing before an impartial decision-maker.

115. Accordingly, the Nuisance Policy violated the right to due process under the U.S. Constitution.

(Compl., ¶¶ 112-115). Based on these sparse allegations, Watson posits violations of both her procedural and substantive due process rights. Maplewood moves to dismiss both claims, basing its arguments both on allegations found elsewhere in Watson's Complaint and, according to Watson, on facts outside the Complaint.

Upon consideration, the Court finds it inappropriate to dismiss Watson's due process claims at this stage of the proceedings. Instead, the Court will permit discovery to proceed on the claims, and Maplewood remains free to reassert its arguments at the summary judgment stage.

## V. **Violence Against Women Act**

In Count V of her Complaint, Watson asserts a claim of preemption by the Violence Against Women Act, 42 U.S.C. § 14043e-11.[12] (Compl., ¶¶ 117-122). In its Motion to Dismiss, Maplewood maintains Watson's VAWA claim is barred by a four year statute of limitations.[13]

VAWA does not contain an express statute of limitations. 28 U.S.C. § 1658 provides in

---

[12] 42 U.S.C. § 14043e-11 has moved to 34 U.S.C. § 12491.
[13] It is undisputed that the actions underlying Watson's claims took place between March and June, 2012, and she did not file her Complaint until April 7, 2017.

relevant part as follows: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." *See* 28 U.S.C. § 1658(a). Thus, "[u]nder the express terms of § 1658, the federal four-year statute of limitations applies if (1) the Act of Congress in question was enacted after December 1, 1990; and (2) there is no explicit legislative directive to apply a different limitation period." *Grace v. Thomason Nissan*, 76 F.Supp.2d 1083, 1090 (D. Ore. 1999).

VAWA was enacted on September 13, 1994. *Grace*, 76 F.Supp.2d at 1090 (citing Pub.L. No. 103-322, 108 Stat. 1902 (1994)). As there is no explicit legislative directive that a statute of limitations other than that provided by § 1658 should apply, the Court finds Watson's claim is both governed and barred by § 1658. *Id.* at 1090-91. This portion of Maplewood's Motion to Dismiss will therefore be granted.[14]

### VI. Res Judicata/*Rooker Feldman*

In its final argument in favor of dismissal[15], Maplewood asserts Watson's claims are barred by the res judicata and/or *Rooker Feldman* doctrines. "Claim preclusion, or res judicata, bars relitigation of the same claim between parties or their privies where a final judgment has been rendered upon the merits by a court of competent jurisdiction." *Plough by and through Plough v. West Des Moines Community School Dist.*, 70 F.3d 512, 517 (8th Cir. 1995) (internal

---

[14] The Court finds unpersuasive Watson's argument that because she allegedly seeks equitable relief rather than damages, a different statute of limitations should apply. *See Roemmich v. Eagle Eye Development, LLC*, 526 F.3d 343, 352 (8th Cir. 2008) (internal quotations and citation omitted) ("Indeed, where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute. To put it simply, parties who sleep on their rights cannot resuscitate time-barred causes of action by seeking equitable remedies.").

[15] The Court will not consider Maplewood's assertion that Watson cannot establish municipal liability in the absence of any individual liability, as it was raised for the first time in Maplewood's reply memorandum.

quotations and citation omitted). "For a claim to be precluded under the doctrine of res judicata due to a determination reached in a prior lawsuit, five elements must be satisfied." *Rutherford v. Kessel*, 560 F.3d 874, 877 (8th Cir. 2009).

> Those elements are: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action. Furthermore, the party against whom res judicata is asserted must [(5)] have had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect.

*Id.* (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998) (internal citations and quotations omitted)).

Upon consideration, the Court finds that res judicata does not act as a bar to Watson's claims. Assuming without deciding that Maplewood could satisfy the first three elements, it fails to satisfy elements four and five. With respect to element four, the Court notes the Maplewood hearing was a municipal procedure conducted pursuant to the City's Nuisance Policy, "to determine whether the situation constitutes a nuisance and, if so, how the nuisance should be abated." (*See* Compl., ¶ 59; ECF No. 1-4). In contrast, this action calls into question fundamental constitutional principles including rights of speech and petition, equal protection, and due process. Such concerns appear to have been outside the parameters of the Maplewood hearing process. *Flandreau Santee Sioux Tribe v. Gerlach*, 155 F.Supp.3d 972, 982-83 (D.S.D. 2015). Furthermore, while Watson's presence was requested at the hearing, and she was informed of her right to hire an attorney and/or to present evidence on her own behalf, the exact procedure adhered to by the Hearing Officer regarding evidence, witness examination, etc., is unclear. *Id.* at 983. Thus, Maplewood fails to establish that Watson had a full and fair opportunity to litigate the matters at issue here in the proceeding that is to be given preclusive effect, and so it cannot establish element five of its res judicata preclusion claim. *Id.*

With respect to *Rooker-Feldman*, "[t]he basic theory….is that only the United States Supreme Court has been given jurisdiction to review a state-court decision, so federal district courts generally lack subject matter jurisdiction over attempted appeals from a state-court judgment." *Dodson v. University of Ark. for Med. Sciences*, 601 F.3d 750, 754 (8th Cir. 2010) (internal quotations and citations omitted), *cert. denied*, 131 S.Ct. 902 (2011). The doctrine is narrow, however, "confined to cases….brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." *Id.* (internal quotations and citations omitted).

> A litigant may challenge in a federal district court action the constitutionality of an executive action, including a state administrative agency determination, even though he may not argue that a state court decision is unconstitutional. Indeed, many litigants who lose in state administrative proceedings [] seek relief in federal district court under civil rights legislation such as 42 U.S.C. § 1983, and they generally do not have to exhaust administrative remedies before pursuing such claims. Litigants can choose whether to pursue such claims in state or federal court. Once a party has litigated in state court, however, he cannot circumvent *Rooker-Feldman* by recasting his or her lawsuit as a [section] 1983 action. In other words, if a litigant has raised and lost claims in state court, he may not recast those claims under section 1983 and try again. He must follow the appellate procedure through the state courts and seek review before the Supreme Court.

*Prince v. Arkansas Bd. Of Examiners in Psychology*, 380 F.3d 337, 340 (8th Cir. 2004) (internal quotations and citations omitted).

Upon consideration, the Court finds *Rooker-Feldman* has no application here, as Watson is not requesting judicial review of a state court ruling, but rather that of an administrative body. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 n. 3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) ("The [*Rooker-Feldman*] has no application to judicial review of executive action, including determinations by a state administrative agency.").

Even assuming the doctrine applies, however, Watson's claims survive. The Eighth

Circuit has elaborated upon the doctrine as follows:

> A federal district court has jurisdiction over general constitutional challenges if these claims are not inextricably intertwined with the claims asserted in state court. A claim is inextricably intertwined if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. In other words, *Rooker-Feldman* precludes a federal action if the relief requested in the federal action would effectively reverse the state court decision or void its ruling.

*Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995) (citations omitted). Accordingly, to determine whether *Rooker-Feldman* bars Watson's federal suit requires determining exactly what the state court held, and whether the relief requested by Watson here requires holding the state court's decision is wrong or voiding its ruling. *Id.*

Upon consideration, the Court notes the Maplewood order found only that the alleged instances of peace disturbance and/or domestic violence resulting in numerous calls to the police constituted a public nuisance pursuant to the Maplewood Nuisance Policy, and thus Watson was subject to the revocation of her occupancy permit. (*See* ECF No. 1-8). A resolution of Watson's constitutional claims in her favor would not require a determination that this limited finding was wrong, *Charchenko*, 47 F.3d at 983, and so the claims are not barred by the *Rooker-Feldman* doctrine.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the City of Maplewood Missouri's Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim (ECF No. 21) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

Dated this 20th Day of October, 2017.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE