IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROSETTA WATSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:17-cv-1268-JCH |
| ) | |
| CITY OF MAPLEWOOD, MISSOURI, ) | |
| et al. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF ROSETTA WATSON'S RESPONSE IN OPPOSITION TO
CITY OF MAPLEWOOD'S MOTION TO DISMISS
<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

Defendant City of Maplewood (the "City") challenges the sufficiency of Plaintiff's First Amended Complaint ("First Amended Complaint") in its most recent motion to dismiss, filed on December 15, 2017.  In doing so, the City seeks review of claims that the Court has already determined were adequately pled by Ms. Watson after reviewing the City's original motions to dismiss filed on June 19, 2017.  ECF 19 and 21.

On October 20, 2017, the Court issued its Memorandum and Order, ECF 46, with respect to the City's original motions to dismiss.  The Court denied the City's motion as to Ms. Watson's Count I (Freedom of Speech and Right to Petition),[1] Count II (Equal Protection as to the enactment of the Nuisance Policy),[2] and Count IV (Due Process).[3]  As Ms. Watson has retained

---

[1]   The Court found that Ms. Watson adequately pled that her calls to the City's police department constituted "constitutionally protected activity," upon which the Nuisance Policy had a chilling effect. ECF 46 at 8-9.  The Court further stated that Ms. Watson sufficiently alleged a claim of retaliation so as to survive the City's motion to dismiss Count I.  *Id.* at 9.  With respect to Ms. Watson's claim that the Nuisance Policy facially violates the First Amendment by imposing penalties on the basis of calls to the police, the Court found that such claim survived Defendants' motion to dismiss as well, entitling Ms. Watson to further discovery.  *Id.* at 10.

[2]   The Court examined Count II of the original Complaint as two separate equal protection claims, the first being the City's discriminatory purpose in enacting the Nuisance Policy and the second being the City's

1

these counts in her First Amended Complaint, she continues to state claims that survive a motion to dismiss, consistent with the Court's October 20, 2017 Memorandum and Order. The Court has discretion to maintain its rulings on the City's original motion to dismiss and should permit the claims against the City to now move forward. *SFF-TIR, LLC v. Stephenson*, 264 F. Supp. 3d 1148, 1219 (N.D. Okla. 2017) (confirming District Court's wide discretion in reviewing an interlocutory order). Accordingly, Ms. Watson hereby reasserts and incorporates the arguments contained in her Response in Opposition to the City of Maplewood's Motion to Dismiss Plaintiff's Complaint. ECF 31.

In addition to asserting the claims described above, Ms. Watson amended Count II (Equal Protection as to the enforcement of the Nuisance Policy)[4] as well as Count III (Right to Travel)[5] in her First Amended Complaint. In this opposition, Ms. Watson asserts that the First Amended Complaint adequately pleads both counts against the City. Ms. Watson further addresses the City's mischaracterization of the law governing municipal liability, as the City remains subject to

---

discriminatory enforcement of the policy. ECF 46 at 10-11. The Court found that Ms. Watson sufficiently stated a claim "that discrimination against women was a motivating factor in Maplewood's decision to enact the Nuisance Policy" and is entitled to further discovery to support her claim as to the enactment of the policy. *Id.* at 11.

[3]   With regard to Ms. Watson's procedural and substantive due process claims, the Court concluded it was "inappropriate to dismiss Watson's due process claims at this stage of the proceedings" and thereby denied the City's initial motion to dismiss as to Ms. Watson's Count IV. ECF 46 at 14.

[4]   In examining Ms. Watson's equal protection claim with regard to the disparate enforcement of the Nuisance Policy, the Court found that a claim had not been alleged that "Maplewood enforces its Nuisance Policy differently for men than women." ECF 46 at 12. In her First Amended Complaint and herein, Ms. Watson clarifies the disparate application of the Nuisance Policy in targeting victims of domestic violence and not victims of other crimes, which she adequately pleads as per the standard required at this stage in the litigation. First Am. Compl., ¶¶ 42-79, 97-104.

[5]   The Court dismissed Count III of the Complaint on the basis that the Eighth Circuit has not recognized a fundamental right "to choose one's place of residence," and upon finding that Ms. Watson asserted her right to intrastate travel as a fundamental right only. ECF 46 at 13. In her First Amended Complaint, Ms. Watson clarifies that the Nuisance Policy restrains the movement of City residents by threatening eviction should the police be called in response to domestic violence; accordingly, the Nuisance Policy violates a recognized constitutional right to travel, beyond simply the right to live anywhere. Further, in her First Amended Complaint, Ms. Watson alleges that the Nuisance Policy fails to promote any legitimate or compelling state interest, in connection with the Court's recognition that a right to travel is subject to rational basis review should a fundamental right not be established. *Id.* at 13, n.11.

liability for its enactment and enforcement of the Nuisance Policy at this stage of the litigation, regardless of any immunity asserted or held by the Individual Defendants.

## ARGUMENT

I. <u>The First Amended Complaint Sufficiently Pleads Ms. Watson's Equal Protection Claims.</u>

Ms. Watson sufficiently pleads that her right to equal protection was violated by the City's adoption and enforcement of the Nuisance Policy. Courts repeatedly have recognized that municipalities' discriminatory treatment of domestic violence victims can violate the equal protection guarantee of the United States Constitution. *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 511 (8th Cir. 2015) (citing *Hynson v. City of Chester*, 864 F.2d 1026, 1031 (3d Cir. 1988)) (resolving issue at summary judgment stage); *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701-02 (9th Cir. 1988). Courts have permitted these claims to move forward on two distinct bases, both plead by Ms. Watson: first, that the City discriminated against domestic violence victims based on gender, a claim subject to heightened scrutiny; and second, that the City discriminated against domestic violence victims compared to other crime victims, a claim subject to rational basis review. *See Villanueva*, 779 F.3d at 511; *Navarro v. Block*, 72 F.3d 712, 716-17 (9th Cir. 1995); *Balistreri*, 901 F.2d at 701-02 (9th Cir. 1988); *Smith v. City of Elyria*, 857 F. Supp. 1203, 1212-13 (N.D. Ohio 1994).

This Court already concluded that Ms. Watson may proceed with an equal protection claim challenging the enactment of the Nuisance Policy. For the reasons discussed *supra*, that ruling should govern the case moving forward. And as discussed in Ms. Watson's prior submission opposing the City's first motion to dismiss, ECF 31, and herein, Ms. Watson

3

adequately pled that the City's enactment and enforcement of the Nuisance Policy violate equal protection.

In her First Amended Complaint, Ms. Watson alleges that Maplewood adopted an ordinance that explicitly targets and penalizes people who make calls regarding domestic violence, that it intentionally discriminated against women and domestic violence victims in doing so, and that Ms. Watson was injured by the Nuisance Policy.  First Am. Compl. ¶¶ 34-35, 76-87, 97-104.  Courts have authorized similar claims to move forward, even when the challenged policy or custom did not specifically refer to gender.  *See Villanueva*, 779 F.3d at 511; *Balistreri*, 901 F.2d at 701-02; *Smith*, 857 F. Supp. at 1212; *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir. 1988); *Thurman v. City of Torrington*, 595 F. Supp. 1521, 1526-29 (D. Conn. 1984).  *See also* U.S. Dep't of Justice, *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence* 23-25 (2015), https://www.justice.gov/opa/file/799366/download.

Notably, the Nuisance Policy targets calls to police with respect to only two types of incidents:  "peace disturbance or domestic violence resulting in calls to the police" (§ 34-240(17)(f)), and "peace disturbance of the public or behavior which intimidates the public committed by unsupervised juveniles resulting in calls to the police" (§ 34-240(17)(g)). Nowhere else in the Nuisance Policy are calls to the police named as the trigger for any enforcement action.  While the second category focuses on calls relating to behavior that broadly injures the public, the first category targets calls regarding domestic violence, a crime that inherently involves harm to individual victims, primarily women, and that is generally reported to the police by victims.  Thus, as alleged in the First Amended Complaint, the Nuisance Policy, by design, punishes domestic violence victims, disproportionately women, who call the police.

4

First Am. Compl. ¶¶ 34-35, 76-87, 97-104.  The City can have no substantial, or even legitimate, interest in enacting a policy that penalizes women domestic violence victims who call the police, when other crime victims who likewise seek police assistance do not face similar consequences. *See* U.S. Dep't of Housing and Urban Dev., *Office of General Counsel on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services* 9 (2016), https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF (observing that cities have a "difficult burden" to show a legitimate interest in enacting ordinances that penalize access to emergency services to victims of domestic violence and other crimes); *Navarro v. Block*, 72 F.3d 712, 717 (9th Cir. 1995) (a county's custom of distinguishing between domestic violence and non-domestic violence calls can fail the rationality test); *C. S. ex. rel. Scott v. Missouri*, 670 F. Supp. 2d 972, 982 (E.D. Mo. 2009) (denying motion to dismiss equal protection claim subject to rational basis review where no discovery had occurred).  While the City has a legitimate interest in addressing public safety, this broad and general interest does not preclude an equal protection challenge to move forward in these circumstances, where the City has adopted a policy that singles out for punishment domestic violence victims, the vast majority of whom are women.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-66 (1977) ("determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available").

In addition, Ms. Watson adequately pleads that the City violated equal protection in its enforcement of the Nuisance Policy.  Ms. Watson alleges that she and other women victims of

5

domestic violence were punished by the City for making calls to the police, that the City acted based on incidents that it knew constituted domestic violence, and that the City has no important or legitimate interest in doing so. First Am. Compl. ¶¶ 42-58, 61-62, 76-79.[6] Her claim challenges the City's decision to enforce the Nuisance Policy against victims of domestic violence, the vast majority of whom are women, while not targeting other similarly situated victims of crime who call the police. First Am. Compl. ¶¶ 76-87, 97-104. Thus, the First Amended Complaint describes how the City's enforcement of the Nuisance Policy against women victims of domestic violence, while not likewise punishing other victims of crimes, violates equal protection under either heightened scrutiny or rational basis review. Federal courts have concluded that sex discrimination claims should move forward when a victim lost her housing following domestic violence incidents. *Dickinson v. Zanesville Metro. Housing Auth.*, 975 F. Supp. 2d 863, 870-73 (S.D. Ohio 2013) (disparate treatment claim based on sex could move forward when housing authority "assigned blame to Plaintiff for actions beyond her control, and used its mounting, but inaccurate, evidence to attempt to force her to leave her apartment"); *Meister v. Kansas City*, No. 09-2544-EFM, 2011 WL 765887, at *6 (D. Kan. Feb. 25, 2011) ("evidence that defendant knew that domestic violence caused damage to plaintiff's housing unit would help support a claim that she was evicted under circumstances giving rise to an inference of sex discrimination"); *Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675, 678 (D. Vt. 2005) (attempt to evict victim three days after domestic dispute could give rise to inference of discrimination on the basis of gender). Moreover, enforcement of the Nuisance Policy against victims of domestic violence is premised on the gender stereotype that domestic violence victims

---

[6]  These allegations are distinct from those raised in the separate case against Maplewood cited by the City, which was brought by a fair housing organization and alleged race, sex, and disability discrimination. The First Amended Complaint here describes how the Nuisance Policy explicitly discriminates against domestic violence victims with no exemptions and is rooted in gender stereotypes about victims of domestic violence, as illustrated by the City's decision to punish Ms. Watson for seeking police aid, even though it knew she was the victim.

should be held responsible for the conduct of their abusers and their calls to law enforcement. First Am. Compl. ¶¶ 76-79.  Federal courts routinely have held that similar allegations of municipal action based on stereotypes about domestic violence victims support claims of intentional gender discrimination.  *See, e.g.*, *Balistreri*, 901 F.2d at 701; *Smith*, 857 F. Supp. at 1212; *Thurman*, 595 F. Supp. at 1528.

The City relies on a factual assertion that is neither supported by the allegations in the First Amended Complaint nor is appropriate for resolution at this early stage of the litigation.  In the First Amended Complaint, Ms. Watson pleads that she was the victim of domestic violence committed by Mr. Hennings, including in all four instances resulting in calls to police cited by the City in enforcing the Nuisance Policy against her.  First Am. Compl. ¶¶ 42-75.  The City attempts to argue that it treated Ms. Watson similarly to Mr. Hennings, by offering evidence that Ms. Watson entered a guilty plea in April 2012, which related only to the last incident that occurred on February 22, 2012.  The City does not address the earlier incidents, where Ms. Watson was deemed by the police to be the victim of assault and domestic assault committed by Mr. Hennings.  First Am. Compl. ¶¶ 42-58, 62.  There is no equivalence between the four incidents committed by Mr. Hennings and the one incident attributed by the City to Ms. Watson.  Under the Nuisance Policy, one incident of domestic violence resulting in a call to police would not provide adequate grounds to move forward against Ms. Watson, particularly when the guilty plea was not adjudicated until after the City began proceedings against her.  Indeed, enforcement against Ms. Watson based on the one instance pointed to by the City only strengthens her claim that the City engaged in selective and unfair enforcement of the Nuisance Policy.

This factual dispute highlights the need for discovery to further develop the record on the City's enforcement of the Nuisance Policy, particularly against victims of domestic violence as

7

compared to other crime victims.  At this stage in the litigation, courts call for only enough facts to state a plausible claim for purposes of a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)).  In her First Amended Complaint, Ms. Watson more than meets this threshold by setting out facts showing that the City intentionally discriminated against her and other domestic violence victims by singling out calls to police regarding domestic violence and enforcing the Nuisance Policy against victims of domestic violence, but not other victims of crime.  First Am. Compl. ¶¶ 42-79, 97-104.

    II.    <u>The First Amended Complaint Sufficiently Pleads Ms. Watson's Constitutional Right to Travel.</u>

In her First Amended Complaint, Ms. Watson sufficiently pleads the Nuisance Policy's violation of her right to travel and clarifies that such violation is subject to rational basis review.  Ms. Watson also continues to plead a fundamental right to travel in order to preserve this claim for possible further review.  As alleged in the First Amended Complaint, the Nuisance Policy adopted and enforced by the City unjustifiably restrains movement and fails to promote a compelling or legitimate state interest.

As Ms. Watson discussed in her opposition to the City's original motion to dismiss, ECF 31, the Supreme Court has articulated a constitutional right to travel that subsumes residency:

> In all the states, from the beginning down to the adoption of the Articles of Confederation, the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom, with a consequent authority in the states to forbid and punish violations of this fundamental right.

*United States v. Wheeler*, 254 U.S. 281, 293 (1920), *disapproved of on other grounds by United States v. Guest*, 383 U.S. 745 (1966). Limitations on residency constitute a violation of the right to intrastate travel, afforded the same protections as interstate travel. *See Johnson v. City of*

8

*Cincinnati*, 310 F.3d 484 (6th Cir. 2002) (upholding right to intrastate travel under Fourteenth Amendment Due Process claim); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2d Cir. 1971) (applying federal right to travel to intrastate residential requirement for public housing); *Bruno v. Civil Serv. Comm'n*, 472 A.2d 328, 336 (Conn. 1984) (recognizing intrastate right to travel on Equal Protection grounds in evaluating residency requirement).  The Nuisance Policy undoubtedly creates a restraint on city residents like Ms. Watson by barring them from contacting the police for assistance or falling victim to a crime at home for risk of forfeiting their homes and constitutional right to reside within the City.  First Am. Compl. ¶¶ 40-75.

The Court observed that policies inhibiting the right to travel have been subject to a determination of whether they meet the standard of "rationally advancing some legitimate governmental purpose," in the event a fundamental right is not determined.  ECF 46, at 13 n.11 (citing *Doe v. Miller*, 405 F.3d 700, 714 (8th Cir. 2005)).  In *Miller*, the Eighth Circuit undertook a rational basis analysis of a restrictive residency policy and ultimately held that the policy at issue advanced a legitimate state interest of promoting child safety by limiting convicted sex offenders from residing within 2000 feet of a school or child care facility.  *Miller*, 405 F.3d at 714.  In contrast to the policy in *Miller*, the Nuisance Policy places a significant barrier to travel on victims of domestic violence by threatening to evict, and actually evicting, victims based on calling for police assistance within the City's limits at one's own residence.  First Am. Compl. ¶¶ 28-39.  In doing so, the Nuisance Policy violates domestic violence victims' rights to be treated like other residents of the City without fulfilling any legitimate state interest.  *See Saenz v. Roe*, 526 U.S. 489, 500 (1999) (specifying that right to travel extends to intrastate travel and includes "the right to be treated like other citizens of that State.").  Instead, the Nuisance Policy

9

further harms a vulnerable population of its residents by creating a mechanism to expel them from the City for seeking protection when faced with situations out of their control.

The broad language of the Nuisance Policy further demonstrates its failure to promote a compelling or legitimate state interest in authorizing the City to revoke a resident's occupancy permit after designating the occupant to be a "nuisance." First Am. Compl. ¶¶ 28-39. The very definition of "nuisance" utilized within the Nuisance Policy fails to specify a type of conduct the City seeks to address, instead providing an expansive and vague list of "nuisances" that gives virtually unbridled discretion to the City to determine what conduct to punish. *Id*. Ms. Watson sufficiently alleges that her constitutional right to travel was impinged upon through the application of the Nuisance Policy and that such policy fails to serve any legitimate or compelling state interest. Accordingly, the City's Motion to Dismiss should be denied.

III. The City is Subject to Municipal Liability for Its Enactment and Enforcement of the Nuisance Policy.

In its motion to dismiss, the City argues that a municipality can avoid liability for an unconstitutional ordinance because the individuals enforcing it are entitled to immunity. That is not the law. The authorities to which the City cites involve situations where a police officer or other enforcement official took a discretionary action whose constitutionality was uncertain.[7] In

---

[7] *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (affirming summary judgment for city on Fourth Amendment claim whose sole basis was that its police officer had slipped on ice and accidentally shot suspect); *Veneklase v. City of Fargo*, 248 F.3d 738, 742, 748 (8th Cir. 2001) (per curiam) (en banc) (dismissing First Amendment claim against city after evidence showed challenged ordinance was constitutional and discussing qualified immunity of the police officers who effectuated arrests under that ordinance as "law of the case" and only as "alternate grounds" for affirmance); *Turpin v. Cty. of Rock*, 262 F.3d 779, 784 (8th Cir. 2001) (affirming summary judgment for county on Fourth Amendment claim whose sole basis was officers' nonreckless omission in warrant application); *Avalos v. City of Glenwood*, 382 F.3d 792, 802 (8th Cir. 2004) (holding, at summary judgment stage, that city was not liable for substantive-due-process claim where "[r]egardless of any alleged deficiencies in the [municipal] procedures," they had not caused the act complained of); *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (affirming summary judgment for city on Fourth Amendment claim whose sole basis was that police officer had arrested suspect based on tip he had reason to know was false).
  In *Veneklase*, the en banc Eighth Circuit ultimately concluded, 6-5, that a Fargo ordinance prohibiting picketing of a single residence was constitutional on its face. 248 F.3d at 746. The case had bounced back and forth between the district and appellate courts, where it generated three panel opinions before its final per curiam

these cases, the discretionary action was the alleged basis for demonstrating that the municipality had a policy, custom, or failure of training or supervision that was unconstitutional.

Here, to the contrary, Ms. Watson challenges the constitutionality of the Nuisance Policy *itself*, memorialized in two city ordinances. Although its application to Ms. Watson demonstrates how she was harmed, enforcement against Ms. Watson does not form the sole basis for alleging municipal liability. To the contrary, the Nuisance Policy on its face shows the City's liability. In other words, what is unconstitutional is not just that the Individual Defendants enforced the Nuisance Policy against Ms. Watson but that the Nuisance Policy exists at all. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("No one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy."); *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (holding that a "municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983"); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) (observing, unanimously, that "municipalities do not enjoy immunity from suit"); *Sample v. City of Woodbury*, 836 F.3d 913, 917 (8th Cir. 2016) (reaffirming that "absolute immunity does not apply to municipalities," reversing dismissal of

---

disposition. It is not clear that *Veneklase* remains good law after the Supreme Court's decision in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), which clarified the level of fit required between an important governmental objective and the content-neutral means chosen to advance it. In any event, it does not preclude Maplewood's liability here, where the Nuisance Policy is both facially unconstitutional and has been unconstitutionally applied, both unlike in *Veneklase*. *See id.* at 746-47 (discussing content neutrality and lack of facial overbreadth), 747-48 (summarizing facts showing no policy of unconstitutional application). The Eighth Circuit rooted its consideration of potential municipal liability on alternate grounds in the robust evidence that had been developed in that case. *See id.* at 748 ("[r]egarding policy or custom, no evidence exists in the record . . . .").

Indeed, the picketers in *Veneklase* argued their conduct was not covered by the Fargo ordinance, where here, Ms. Watson acknowledges her calls to the police could be covered by the Nuisance Policy but are nonetheless entitled to First Amendment protection. So there was a disconnect between the Fargo ordinance and the alleged enforcement of some other city policy against the picketers, but here it is the Nuisance Policy itself that directly provided for enforcement against Ms. Watson.

claim against municipality on absolute-immunity grounds, and commenting that—in part because of the immunities available to individual defendants—"[e]xtending immunity protections to municipalities as the City proposes would leave innocent persons harmed by the abuse of governmental authority without a remedy for compensation for their injury"); *see Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (describing *Monell* and its progeny and commenting that "*Monell* established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself" and that "[w]here a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally," municipal liability also attaches).  These decisions distinguishing officers, who may have immunity, from municipalities, which definitively do not, would be meaningless if municipalities could end-run around them by escaping liability every time their officers have immunity.

The City relies on *Patterson v. Von Riesen*, 999 F.2d 1235 (8th Cir. 1993), but the Eighth Circuit has already explained why it is inapposite.  *See Sample*, 836 F.3d at 917 n.3.  In *Patterson*, faulty jury instructions caused a man to be convicted of—and sentenced for—a crime not charged.  *Patterson*, 999 F.2d at 1236.  He filed a successful habeas petition and then sued every individual involved in keeping him in prison: the prosecutors, wardens, and members of the state parole board.  He also sued the county where he had been charged.  His sole theory of recovery against the latter was "ratification."  *Id.* at 1241 n.2.  As the City notes, the court held that the county could not be liable under that theory.  *Id.*; *compare also Veneklase*, 748 F.3d at

12

748 (quoting district court description of plaintiffs' claim as "municipal liability premised on a ratification theory").

The Eighth Circuit clarified this holding in a later case.  In *Sample*, a plaintiff sued the city of Woodbury and its attorneys, alleging that Woodbury's failure to develop a conflict-of-interest policy had permitted the city's attorneys to prosecute him for a crime while simultaneously representing his alleged victim in a civil action against him.  The district court held that the attorneys were entitled to absolute immunity and dismissed the lawsuit.  The Eighth Circuit reinstated the plaintiff's claim against the city of Woodbury, holding that there is no "derivative" absolute immunity for municipalities.  It noted that the *Patterson* court had "relied on a *respondeat superior* theory to find the county not liable" and that "immunity from suit and freedom from *respondeat superior* liability are separate doctrines."  836 F.3d at 917 n.3.  Therefore, the *Sample* court held, there was no conflict between *Patterson* and the court's decision to permit the city of Woodbury claim to proceed despite its prosecutors' entitlement to absolute immunity.  *See also Mansaw v. Midwest Organ Bank*, No. 97-0271-CV-W-6, 1998 WL 386327, at *6 (W.D. Mo. July 8, 1998) (distinguishing *Patterson* because "there [was] an independent basis for recovery against the [defendants], that is, a potentially unconstitutional policy").

Under *Sample*, the immunity of the individual defendants is irrelevant to determining whether the City can be held liable for enacting and enforcing an ordinance unconstitutional both on its face and as applied.  For the reasons provided in the Court's earlier Memorandum and Order denying in part Defendants' initial motions to dismiss, Ms. Watson's allegations are sufficient at this stage to state constitutional claims against the City under the First and Fourteenth Amendments.

13

## CONCLUSION

For the reasons stated above, the City's motion should be denied.

Dated: January 10, 2018                              Respectfully submitted,

/s/ Kenneth J. Mallin
Kenneth J. Mallin, #33307MO
Saher Valiani, #69402MO
Bryan Cave LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
kjmallin@bryancave.com
saher.valiani@bryancave.com

Anthony E. Rothert, #44827MO
Jessie Steffan, #64841MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
arothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Suite 420
gwilcox@aclu-mo.org

Sandra S. Park, #4122370NY
Lenora M. Lapidus, #2414225NY
ACLU Women's Rights Project
125 Broad Street, 18th Fl.
New York, NY 10004
(212) 519-7871
spark@aclu.org
llapidus@aclu.org

*Counsel for Plaintiff*

<u>Certificate of Service</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing was served via the Court's electronic notification system upon all counsel of record this 10th day of January, 2018.

/s/ Kenneth J. Mallin

Kenneth J. Mallin